USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/2/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
UNITED STATES OF AMERICA                 :

                                         :        S2 18-CR-579 (JSR)

        -v-                              :

                                         :        OPINION AND ORDER

SEBASTIAN PINTO-THOMAZ and               :
JEREMY MILLUL,                           :

                                         :
        Defendants.                      :
----------------------------------x

JED S. RAKOFF, U.S.D.J.

The crime of insider trading is a straightforward concept that some courts have somehow managed to complicate. Essentially, insider trading is a variation of the species of fraud known as embezzlement, which is defined in Black's Law Dictionary as "[t]he fraudulent taking of personal property with which one has been entrusted, especially as a fiduciary." Black's Law Dictionary (10th ed. 2014). In the case of insider trading, the property is a company's material confidential information that has value to the embezzler because of its potential use in the purchase and sale of securities. See United States v. O'Hagan, 521 U.S. 642, 654 (1997). Insider trading occurs when someone to whom this property has been entrusted pursuant to a fiduciary or similar relationship secretly embezzles, or "misappropriates," the information in order to take advantage of its securities-related value. If the embezzler, instead of trading on the information himself, passes

1

on the information to someone who knows it is misappropriated information but still intends to use it in connection with the purchase or sale of securities, that "tippee" is likewise liable, just as any knowing receiver of stolen goods would be.

It is just that simple - or, conceptually, should be. But, as described below, some judicial decisions appear to have added complications.

These observations are prompted by the instant motion to dismiss of defendants Sebastian Pinto-Thomaz and Jeremy Millul, who are charged in a superseding indictment ("the Indictment") with substantive securities fraud and conspiracy to commit securities fraud.[1] The Indictment alleges that Pinto-Thomaz, having received in a fiduciary capacity material nonpublic information concerning the forthcoming acquisition of the Valspar Corporation by the Sherwin-Williams Company, secretly misappropriated the information and provided it to Millul "with the intention to benefit" Millul by enabling him to trade profitably on the acquisition prior to its public announcement. See Indictment ¶¶ 5, 20.

---

[1] The Indictment supersedes a six-count indictment filed on August 10, 2018 ("original indictment") against Pinto-Thomaz, Millul, and Abell Oujaddou. Dkt. 24. Oujaddou subsequently pled guilty to a separate superseding indictment filed November 1, 2018. Dkt. 64, 65. The original indictment included both securities fraud and wire fraud charges.

In their motion, defendants argue that the Indictment should be dismissed as to both the tipper (Pinto-Thomaz) and the tippee (Millul) because the Indictment fails to allege that they shared a "meaningfully close personal relationship." United States v. Newman, 773 F.3d 438, 452 (2d Cir. 2014). This Opinion and Order first addresses the motion to dismiss, and then turns to a number of additional motions made by one or both defendants.

## I. **Motion to Dismiss**

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder broadly prohibit any person from using any "scheme or artifice to defraud" "in connection with the sale or purchase of any security." 17 CFR § 240.10b-5 (2016); 15 U.S.C. § 78j(b). Embezzlement of a company's confidential information is unquestionably a fraud. As the Supreme Court has stated, "[a] company's confidential information...qualifies as property to which the company has a right of exclusive use," O'Hagan, 521 U.S. at 654,[2] and, accordingly, "undisclosed misappropriation of such information, in violation of a fiduciary duty...constitutes fraud akin to embezzlement - the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." Id. If

---

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

the embezzlement is for the purpose of using the information to trade, or to have others trade, in the securities market, it would seem to be a straightforward violation of Rule 10b-5.

Historically, insider trading charges were first pursued primarily against company executives who took advantage of their knowledge of the company's confidential information to purchase company stock from their own unwitting shareholders. See, e.g., S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc). Although sometimes referred to as the "classical theory" of insider trading, O'Hagan, 521 U.S. at 652, this was in fact a rather narrow approach, and the U.S. Securities and Exchange Commission ("SEC") itself had to labor somewhat to apply it even to the situation where a company executive or his agent used the company's negative inside information to sell short. See Chiarella v. United States, 445 U.S. 222, 227 n.8 (1980) (briefly describing this development). The Government also was only gradually able to extend the classical theory to "tippees" who traded on inside information supplied by the tipper. See Dirks v. SEC, 463 U.S. 646, 659-61 (1983). Thus, by the time the classical theory of insider trading reached its first challenge in the Supreme Court in 1980, it was clear that there were formidable limits on its application. See Chiarella, 445 U.S. at 235(reversing attempt to extend the classical theory

4

to embrace fraud on shareholders to whom no fiduciary duty was
owed).

After the reversal in Chiarella, however, the Government,
acting on a suggestion in Chief Justice Burger's dissent, 445
U.S. at 243, set about devising a more straightforward theory of
insider trading liability - a theory based on the well-
established law of embezzlement and known as the
"misappropriation theory." In 1997, the Supreme Court in
O'Hagan, endorsed this theory and held it broadly applicable to
both insiders and outsiders, tippers and tippees, who traded on
information they knew to be embezzled. See O'Hagan, 521 U.S. at
652-53 ("the misappropriation theory outlaws trading on the
basis of nonpublic information by a corporate 'outsider' in
breach of a duty owed not to a trading party, but to the source
of the information").[3]

Well before the approval of the misappropriation theory in
1997, however, the Supreme Court was confronted in 1983 with a
rather unusual case brought under the classical theory, Dirks v.
SEC, 463 U.S. 646 (1983). In that case, Ronald Secrist, the
"tipper," contacted Raymond Dirks, the "tippee," and provided
material nonpublic information concerning a corporation where

---

[3]While the "classical theory" may still be occasionally employed
even today, it is hard to imagine an insider trading case that
does not fit comfortably within the confines of the
misappropriation theory.

Secrist formerly worked. Id. at 648-49. But Secrist was acting solely in a whistleblower capacity, informing Dirks, an investment specialist, that the corporation's assets were "vastly overstated" as the result of fraud and that the SEC had failed to act on reports of the fraud. Id. at 649. He therefore "urged Dirks to verify the fraud and disclose it publicly." Id. Dirks proceeded to investigate the allegations and to discuss them with a number of individuals, including his firm's investors, the news media and, eventually, the SEC. Id. 649-50. The fraud was finally exposed "[l]argely thanks to Dirks," Id. 652 n.8, and several of the company's executives went to prison. Yet the SEC found Dirks liable for insider trading because Dirks had disclosed to some of his firm's clients material information received from Secrist before the information was disclosed to the public. Id. at 650-51.

The Supreme Court reversed. Rejecting the SEC's determination, the Supreme Court explained that Dirk's disclosure to his firm's clients of the nonpublic information he received from Secrist could serve as the basis of insider trading liability only where Secrist's prior disclosures to Dirks were a breach of Secrist's fiduciary duty. Id. at 654. Both sides acknowledged as much. But the Court then went further and stated that "[w]hether disclosure is a breach of duty...depends in large part on the purpose of the disclosure,"

6

id. at 662, and that "the test is whether the insider personally will benefit, directly or indirectly, from his disclosure." Id. Although this was novel law, the Court reasoned that this test was consistent with the "purpose of the securities laws...to eliminate use of inside information for personal advantage." Id. (citing the SEC's decision in In re Cady, Roberts & Co., 40 S.E.C. 907, 912 n.15 (1961)).

Thus was born the requirement that the tipper receive a "personal benefit." It should be noted that Dirks – which, quite aside from its unusual facts, was prosecuted under the "classical theory" of insider trading several years before the Supreme Court approved the broader embezzlement theory of insider trading in O'Hagan, 521 U.S. 642 – could easily have been treated as sui generis. Secrist, after all, arguably had a legal duty to report the company's fraud that overrode any fiduciary requirement. See 18 U.S.C. § 4 (establishing criminal liability for "[w]hoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same").

In the event, however, Dirks was given wide application. But in some courts it appears to have been misunderstood, especially in regard to what the Supreme Court meant by "personal benefit." On any fair reading, it should have been

7

clear that the Court in Dirks was using the term "personal
benefit" simply to distinguish between a lawfully-acting
fiduciary and someone who embezzles for personal advantage. In
particular, the Court expressed concerns that a company
executive who unwittingly disclosed confidential information to
an outside analyst for what the executive thought was a
legitimate corporate purpose should not thereby expose himself
to liability. Dirks, 463 U.S. at 662. The Court in Dirks
explained that the fraud required to establish insider trading
pursuant to Rule 10b-5 "derives from the inherent unfairness
involved where one takes advantage of information intended to be
available only for a corporate purpose and not for the personal
benefit of anyone." Id.at 654; see also id. at 655 n.14 ("The
basis for recognizing this fiduciary duty is not simply that
such persons acquired nonpublic corporate information, but
rather that they have entered into a special confidential
relationship in the conduct of the business of the enterprise
and are given access to information solely for corporate
purposes."). None of this suggested that "personal benefit"
consisted of any particular kind of benefit, but only that it
was a benefit grounded in using company information for personal
advantage, as opposed to a corporate or otherwise permissible
purpose (such as whistleblowing).

In furtherance of this point, the Court in Dirks described the concept of personal benefit quite broadly. For example, in giving a non-exclusive list of possible personal benefits, the Court stated that a benefit may be "such as a pecuniary gain or a reputational benefit that may translate into future earnings," or may be inferred from "a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the particular recipient," or may be satisfied "when the insider makes a gift of confidential information to a trading relative or friend" that "resemble[s] trading by the insider himself followed by a gift of the profits to the recipient." Id. at 663-664 (emphasis added). These, the Court further stated, were only examples of the possibilities for satisfying the "personal benefit" requirement. Id. The common feature was simply that they all involved diverting the information for a personal, rather than a corporate purpose.

As this discussion illustrates, while use of the term "personal purpose" or "personal advantage," rather than "personal benefit," could perhaps have averted subsequent confusion, Dirks was quite clear as to the wide breadth of its understanding of a personal benefit.

Thereafter, most lower courts, consistent with this understanding, recognized a broad variety of qualifying personal benefits. See United States v. Martoma, 894 F.3d 64, 74 (2d Cir.

2017) (collecting post-Dirks cases recognizing a "wide variety of personal benefits" varying from the tipper and tippee being "friends from college" to the tipper receiving "live lobsters" from the tippee). But then along came the Second Circuit's decision in United States v. Newman, 773 F.3d 438 (2d Cir. 2014), rev'd in part, United States v. Salman, 137 S. Ct. 428 (2016). Newman made three holdings. The first was unexceptional. Newman affirmed that, for a tippee to be liable for insider trading, the tippee must know that the insider "disclosed confidential information in exchange for personal benefit." Id. at 449. This principle again mirrors embezzlement law, which requires that the receivers of stolen goods may only be held criminally liable if they know the goods were stolen.

However, Newman next held (in arguable departure from both prior precedents and the express language of Dirks) that the tipper's personal benefit must be "a potential gain of a pecuniary or similarly valuable nature" or "future pecuniary gain" rather than the "ephemeral benefit" of friendship alone. Newman, 773 F.3d at 452. Thereafter, however, the Supreme Court overruled this holding as "inconsistent with Dirks." United States v. Salman, 137 S. Ct. 420, 428 (2016).

Finally, of direct relevance to the instant motions, Newman introduced a novel requirement that, in order to infer a personal benefit from the relationship between the tipper and

10

the tippee (as expressly authorized under Dirks), the Government must prove that the tipper and tippee share a "meaningfully close personal relationship." Newman, 773 F.3d at 452.

Nowhere in Newman is the term "meaningfully close personal relationship" defined, other than in being "objective" and "consequential." Id. Vagueness quite aside, however, the difficulty of reconciling this requirement with Dirks is immediately apparent, as Dirks provides without limitation that insiders are prohibited from "giv[ing] such [inside] information to an outsider for the same improper purpose of exploiting the information for their personal gain" as they are from "using undisclosed information for their own advantage." 463 U.S. at 659.

In their motion to dismiss, defendants argue that Salman purposely left Newman's "meaningfully close personal relationship" requirement wholly intact when overruling its conclusion as to a pecuniary gain requirement. See Millul Reply ("M Reply") at 18. It is correct that Salman did not directly address the Newman's "meaningfully close personal relationship" requirement. But this was because Salman concerned disclosure of confidential information between family members and therefore the degree to which any specific type of non-familial relationship must be shown was not before the Court.

11

The Second Circuit recognized as much in its original opinion in United States v. Martoma, where it stated that the Salman Court had no occasion to directly address the "meaningfully close personal relationship" requirement; but Martoma nonetheless reasoned that requirement was inconsistent with the logic of Salman. See 869 F.3d 58, 69 (2d Cir. 2017)("Martoma I") ("Salman fundamentally altered the analysis underlying Newman's 'meaningfully close personal relationship' requirement such that the 'meaningfully close personal relationship' requirement is no longer good law."), amended by United States v. Martoma, 894 F.3d 64 (2d Cir. 2017) ("Martoma II"). The Court noted that Salman had expressly relied on the holding in Dirks (quoted above) that "an insider or tipper personally benefits from a disclosure of inside information 'with the expectation that [the recipient] would trade on it,'" since the disclosure "'resemble[s] trading by the insider followed by a gift of profits to the recipient.'" Martoma I, 869 F.3d at 70 (quoting Salman, 137 S. Ct. at 427-28 (quoting Dirks, 463 U.S. at 664)). This general proposition, applicable to any intentional tip of insider information to even a comparative stranger (Martoma I uses the example of a holiday gift to a doorman), in no way depends on there being a "meaningfully close personal relationship" between the tipper and tippee. Id.

12

However, Judge Pooler dissented from Martoma I on the ground, inter alia, that the panel had no power to overrule the decision of the prior panel in Newman to the extent it had not been expressly overruled in Salman. Id. at 74. Perhaps in reaction thereto, the panel in Martoma issued an amended opinion that no longer expressly overruled the "meaningfully close personal relationship" requirement, but instead defined its very narrow application. See Martoma II, 894 F.3d 64. Of particular relevance here, the Martoma II Court held that Newman's concept of a "meaningfully close personal relationship" only applies, at most, to situations where a fact-finder is asked to infer an adequate personal benefit simply from the relationship between the tipper and tippee. But, Martoma II held, Newman did not alter (and indeed had no power to alter) the holding in Dirks that a personal benefit can be inferred from either "a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the latter." Id. at 77-78 (emphasis added). Accordingly, either a quid pro quo relationship or an intention of conferring a benefit suffice to show a personal benefit "and neither requires proof...[of] any type of personal relationship," let alone the "meaningfully close relationship" propounded in Newman. Id. at 78. What remains of Newman therefore applies in only the rarest of cases.

13

Turning to the case at hand, it follows that the Indictment's failure to allege that Millul and Pinto-Thomaz had a "meaningfully close relationship" is irrelevant, because the Indictment expressly alleges that Pinto-Thomaz had an "intention to benefit" Millul, Indictment ¶ 20, which, under Martoma II, let alone Dirks, is sufficient.

Defendants argue in the alternative that, even if Newman was overruled or altered by subsequent jurisprudence, "principles of fundamental fairness" require the full application of Newman as the trades at issue in this case took place after Newman, but before Salman and Martoma, had been decided. See Millul Motion to Dismiss All Counts of the Indictment ("MTD"), Dkt. 48, at 9. Specifically, defendants allege that the ex post facto clause, due process clause, and rule of lenity require the application of Newman in these circumstances. Id. at 11. These arguments are wholly devoid of merit. The "Ex Post Facto Clause, by its own terms, does not apply to courts." Rogers v. Tennessee, 532 U.S. 451, 460 (2001). Retroactive application of a judicial construction of a criminal statute violates due process rights only where the judicial construction "is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," for instance, where a court "overrules a consistent line of procedural decisions with the retroactive effect of denying a

14

litigant a hearing in a pending case" or an unforeseeable decision applied to past conduct deprives the defendant "of fair notice that his contemplated conduct constitutes a crime." Bouie, 378 U.S. at 354. This is not the case here. To the extent that Newman held that "a tipper must also receive something of a pecuniary or similarly valuable nature in exchange for a gift to family or friends," it was always "inconsistent" with Supreme Court precedent in Dirks, and, accordingly, was overruled by the Supreme Court a mere two years later. See Salman, 137 S. Ct. at 428. Similarly, to the extent that Newman grafted an additional requirement of a "meaningfully close personal relationship" on to the "intention to benefit" means of establishing personal benefit under Dirks, it was inconsistent with Dirks and, moreover, the Second Circuit has affirmed that it imposed no such additional requirement in the context of this case. See Martoma II, 894 F.3d at 77-78.

Finally, defendants have shown "no grievous ambiguity or uncertainty that would trigger" the application of the rule of lenity. Barber v. Thomas, 560 U.S. 474, 492 (2010). The indictment's allegations that Pinto-Thomaz gave information to Millul with the intention to benefit Millul is directly, explicitly encompassed by Dirks's rule concerning "intention to benefit the particular recipient." 463 U.S. at 664.

15

Accordingly, defendants' motion to dismiss the indictment is denied.[4]

## II. **Motion for a Bill of Particulars**

Pursuant to Federal Rule of Criminal Procedure 7(f), the Court may "direct the government to file a bill of particulars" upon defendants' motion "before or within 10 days after arraignment or at a later date if the court permits." Fed. R. Crim. P. 7(f). "The purpose of a bill of particulars is to supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense." United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). "Because a bill of particulars confines the government's evidence at trial to the particulars

---

[4] Defendants also moved to dismiss the wire fraud counts in the original indictment. See MTD; Pinto-Thomaz Motion to Dismiss Counts Two, Five, and Six, Dkt. 35. As the subsequently-filed superseding indictment does not contain wire fraud counts, the motions to dismiss these counts are denied as moot. Similarly, Millul made several arguments in his initial memorandum concerning the securities fraud counts in the initial indictment that have been mooted by changed language in the superseding indictment. See MTD.

16

furnished, a court must balance restricting the government's proof against protecting defendants from surprise." United States v. Rajaratnam, No. 09-cr-1184, 2010 U.S. Dist. LEXIS 70385, at *3 (S.D.N.Y. Jul. 13, 2010). "The decision to grant a bill of particulars is left to the discretion of the trial court." United States v. Russo, 483 F. Supp. 2d 301, 310-11 (S.D.N.Y. 2007).

In considering whether a bill of particulars is required, the Court considers not only the information provided in the indictment, but also discovery materials and other information provided to the defendant. See United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) ("Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."); United States v. Monserrate, No. 10-cr-965, 2011 U.S. Dist. LEXIS 87216, at *10 (S.D.N.Y. Aug. 4, 2011) (request for bill of particulars denied where "the Indictment and discovery materials are sufficient to apprise the defendant of the charge against him").

Millul, joined by Pinto-Thomaz, initially moved for a bill of particulars as to all counts of the original indictment. See Memorandum of Law in Support of Jeremy Millul's Motion for a Bill of Particulars ("MBP"), Dkt. 51; PT MTD Notice at 1. Following the filing of the superseding indictment, Millul

17

maintains the motion as to the remaining insider-trading and conspiracy counts. See M Reply at 21-22.

Defendants are correct that "[t]here is precedent for directing the filing of a bill of particulars in an insider trading conspiracy case." Rajaratnam, 2010 U.S. Dist. LEXIS 70385, at *6 (S.D.N.Y. Jul. 13, 2010) (collecting cases); see also MBP at 4-5. However, courts' decisions to grant bills of particulars are not predetermined by the nature of the charges filed, but dependent upon the complexity of the facts at issue and degree of disclosure already offered. For instance, in Rajaratnam, the case upon which defendants primarily rely, see MBP at 5-6, the court's decision to grant in part defendants' motion for a bill of particulars turned on the fact that the case was "far larger" than any others cited, involving 31 stocks and "dozens of co-conspirators, charged and uncharged." Id. Notably, the instant case does not involve such complexities: it charges insider trading of one specific stock based on material nonpublic information exchanged during a specified period of time between Pinto-Thomaz and his co-defendants.

Defendants argue that a bill of particulars is necessary to particularize exactly what material nonpublic information Pinto-Thomaz allegedly conveyed to Millul. MBP at 6-7. However, the Indictment clearly describes the overall nature of the information here in issue, at what time and in what capacity

18

Pinto-Thomaz acquired this information, Pinto-Thomaz's subsequent contact with Millul, and Millul's trades thereafter. This is sufficient, especially given the fact that the discovery provided to the defense, encompassing the results of multiple search warrants and in electronically-searchable form, included all the material nonpublic information that Pinto-Thomaz received in connection with the acquisition. Govt. Opp. at 67.

Furthermore, in its opposition to defendants' motion, the Government represents that its only proof of the specific content of the communications between Pinto-Thomaz and Millul is "circumstantial" and that it is "infer[ing] from the facts regarding Millul's and Pinto-Thomaz's conduct that they discussed the material, nonpublic information that Pinto-Thomaz possessed." Govt. Opp. at 69. Millul argues that the Government "should be required to disclose now whatever inferences it has drawn regarding what [material nonpublic information] was allegedly conveyed." Millul Reply at 21. This is a demand for exactly what a bill of particulars is specifically barred from doing: compelling the Government to "disclos[e] the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." United States v. Mitlof, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001). Accordingly, as the Court finds that defendants have more than

19

sufficient information concerning the material nonpublic information allegedly disclosed to prepare for trial, the motion for a bill of particulars on this ground is denied.

Defendants also argues that a bill of particulars is necessary as to the conspiracy counts, which alleges participation in a conspiracy with "others known and unknown," to identify all unindicted co-conspirators known to the Government. MBP at 4, 10. The Government does not address this request in its opposition. In considering whether the Government should be required to identify unindicted co-conspirators, the Court must balance the risk of surprise to the defendant, which is enhanced if "there are a large number of co-conspirators and a long-running conspiracy" with legitimate law enforcement concerns, such as the "potential danger to co-conspirators and the risk of compromising continuing investigations." United States v. Bin Laden, 92 F. Supp. 2d 225, 241 (S.D.N.Y. 2000). Here, while there is no allegation of a long-running conspiracy and Millul is only alleged to have conspired with Pinto-Thomaz, it would meaningfully alter the nature of the charges and, accordingly, Millul's preparation for trial if it were revealed that the Government considered him to be conspiring with other individuals, rather than only Pinto-Thomaz.[5] The Government has

---

[5] Pinto-Thomaz is also alleged to have conspired with Oujaddou, who is charged in a separate superseding indictment, see supra

made no showing that there would be any risk of compromising a continued investigation or other dangers resultant from identifying unindicted co-conspirators. In fact, the Government represents that the underlying conduct concerns "only two defendants," Govt. Opp. at 66; if this is in fact the scope, there should be little burden to the Government in confirming that there are no unindicted co-conspirators whose identities are known at this time. Therefore, the Court grants the motion for a bill of particulars as to the identities of unindicted co-conspirators.

## III. Motions to Suppress

Defendants have moved to suppress the evidence resulting from three search warrants in this case: (1) a search warrant for Millul's Gmail Account issued by Magistrate Judge Peck in January 2018 ("Millul Gmail Warrant"), (2) a search warrant for Pinto-Thomaz's Apple iCloud Account issued by Magistrate Judge Peck in January 2018 ("Pinto-Thomaz iCloud Warrant"), and (3) a search warrant for Millul's iPhone issued by Magistrate Judge Fox in June 2018 ("Millul iPhone Warrant"). See Memorandum of Law in Support of Sebastian Pinto-Thomaz's Motion to Suppress Items Seized Pursuant to the Apple iCloud Search Warrant, Dkt.

---

note 1, but it would similarly affect the nature of the charges against Pinto-Thomaz and his trial preparation if he was alleged to have additional co-conspirators.

21

39 ("PTMTS"); Defendant Jeremy Millul's Motion to Suppress and

for the Return of Property, Dkt. 45 ("MMTS"). As the language in

all three of the warrants is substantively the same, the

arguments advanced in the motions for suppression are largely

overlapping and will be discussed jointly.

Millul and Pinto-Thomaz both argue that the evidence

obtained pursuant to the respective warrants must be suppressed

because the warrants were invalid as issued, or, in the

alternative, because the executing agents failed to abide by the

constraints of the warrant. Id. Additionally, Millul argues that

the evidence obtained pursuant to the iPhone warrant must be

suppressed because law enforcement allegedly asked him for his

iPhone passcode after he had requested counsel. MMTS at 40.

The Court will address each of these theories in turn.

## A. Validity of the Warrants as Issued

The Fourth Amendment provides that "a warrant may not be

issued unless probable cause is properly established and the

scope of the authorized search is set out with particularity."

United States v. Galpin, 720 F.3d 436, 445 (2d Cir. 2013).

"Probable cause is not a high bar." District of Columbia v.

Wesby, 138 S. Ct. 577, 586 (2018). It exists where "the totality

of circumstances indicates a fair probability that contraband or

evidence of a crime will be found in a particular place."

Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007) (emphasis

added). "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id.

The warrant must also "identify the specific offense for which the police have established probable cause," "describe the place to be searched," and "specify the items to be seized by their relation to designated crimes." Galpin, 720 F.3d at 445-46. A warrant is overbroad if "its description of the objects to be seized...is broader than can be justified by the probable cause upon which the warrant is based." United States v. Wey, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017). A warrant must also be sufficiently particular to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." United States v. George, 975 F.2d 72, 75 (2d Cir. 1992). However, "[t]he Fourth Amendment does not require a perfect description of the data to be searched and seized." United States v. Ulbricht, 858 F.3d 71, 100 (2d Cir. 2017).

The Second Circuit has instructed courts to apply "a heightened sensitivity to the particularity requirement in the context of digital searches" given the scope of personal information potentially involved. Galpin, 720 F.3d at 447. However, as long as the items are described "with as much

particularity as the circumstances reasonably allow," courts "may tolerate some ambiguity in the warrant." Id. at 446. The level of specificity required depends on the nature of the crime and its level of complexity. See, e.g., United States v. Levy, No. 11-cr-62, 2013 U.S. Dist. LEXIS 25508, at *19-31 (S.D.N.Y. Feb. 25, 2013), aff'd, 803 F.3d 120 (2d Cir. 2015) (broad warrant justified by complexity of fraud); United States v. Dupree, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011) ("The nature of the crime...may require a broad search" including where "complex financial crimes are alleged").

In reviewing the validity of a warrant previously issued by a Magistrate Judge, a court must provide "substantial deference" to the Magistrate Judge's finding of probable cause and warrant validity. United States v. Jennings, 301 Fed. Appx. 91, 92 (2d Cir. 2008). "With respect to a challenge to the probable-cause determination, the duty of a court reviewing the validity of a search warrant is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993). Any "doubts should be resolved in favor of upholding the warrant." Id. This "deference derives not only from the law's recognition that probable cause is a fluid concept that can vary with the facts of each case, but also from its strong preference for

searches conducted pursuant to a warrant." United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011).

Contrary to defendants' arguments, the warrants concerned in this case were supported by ample probable cause. The accompanying affidavits detailed that Pinto-Thomaz had received material nonpublic information concerning the Valspar-Sherwin-Williams acquisition, had contacted Millul and Oujaddou by phone and text, and that Millul and Oujaddou had subsequently bought shares of Valspar stock, which they sold immediately following the public announcement of the acquisition. See Affidavit in Support of Pinto-Thomaz iCloud Warrant, Ex. A, Declaration in Support of Sebastian Pinto-Thomaz's Pretrial Motion to Suppress, Dkt. 40-1; Affidavit in Support of Millul Gmail Warrant, Ex. A. Declaration of Michelle J. Shapiro in Support of Defendant Jeremy Millul's Motions ("Shapiro Dec."), Dkt 52-1; Affidavit in Support of Millul iPhone Warrant, Ex. C, Shapiro Dec.

Defendants argue that the warrants failed to establish probable cause that the specific accounts and devices being searched would contain all categories of information that the warrant authorized searching for, see MMTS at 12 and PTMTS at 10, but the affidavits reveal ample probable cause connecting these accounts and devices to the crimes charged and the searches specified. For the Gmail account, the affidavit set forth instances where email notifications regarding trading

25

activity in Millul's ETrade account, including the trades in

Valspar stock at issue, were emailed from ETrade to the Gmail

account. For the iCloud account, the affidavit recounts that

Pinto-Thomaz used a telephone number connected with the iCloud

account to exchange text messages with Oujaddou before

Oujaddou's purchases of Valspar. For the Millul iPhone, the

affidavit states that Millul communicated with Pinto-Thomaz

before beginning trading and that he used the messaging

application WhatsApp.[6] Contrary to defendants' arguments, the

affidavits for search of a device or account do not have to

provide specific evidence that every category of evidence sought

will be present in that device or account, but can rely on the

affiants' training, experience, and the totality of the

circumstances to support a "common-sense" probability that the

evidence may be found there sufficient for probable cause.

See United States v. Singh, 390 F.3d 168, 182 (2d Cir.

---

[6] With regard to the iPhone Warrant, Millul further argues that
the affidavit fails to provide "probable cause that the cell
phone to be searched even existed at the time of the alleged
criminal acts," describing the affidavit's assertions that the
iPhone either existed at the time or had data from the time
transferred onto it as impermissible "guesswork." MMTS at 23-24.
This argument attempts to graft on a higher standard of evidence
than probable cause requires. The affidavit specifically alleges
that Millul exchanged text messages and phone calls with Pinto-
Thomaz at the time of the alleged crime, permissibly relying on
the agent's experience and commonsense that data is often
transferred from old to new cell phones. See Illinois v. Gates,
462 U.S. 213, 231-32 (1983).

2004)(noting that the nexus between the items sought and the particular place to be searched "may be based on reasonable inference from the facts presented based on common sense and experience.").

Defendants cite United States v. Zemlyansky, 945 F. Supp. 2d 438 (S.D.N.Y. 2013), for the principle that a warrant must be suppressed where the supporting affidavit fails to justify the sweep of items enumerated in the warrant, but the warrant in Zemlyansky, unlike the warrants at issue in this case, suffered from myriad fatal deficiencies including failing to "inform[] the searching officer for which crimes the search is being undertaken," id. at 454, while "authoriz[ing] the officers to search for and seize almost everything that one could expect to find at a billing office," and "confer[ing] on the searching officers discretion to seize virtually everything short of any diaries, clothing, and love letters that employees may have brought to work," id. at 459. Here, the warrants are cabined to evidence necessary to prove securities fraud.

Defendants also advance a number of arguments that the warrants concerned are either overbroad or lack particularity.[7] First, defendants argue that the warrants concerned were

_____

[7] "Although somewhat similar in focus, particularity and overbreadth are two distinct legal issues." Lustyik, 57 F. Supp. 3d at 228. However, as defendants challenge the warrants on both grounds, they will be discussed here in tandem.

27

overbroad and lacked particularity because they lacked a temporal limitation on all categories of information sought. See PTMTS at 8-9, MMTS at 10, 22. However, a temporal limitation "is not an absolute necessity, but is only one indicium of particularity" in a warrant. United States v. Hernandez, No. 09-cr-625, 2010 U.S. Dist. LEXIS 719, at *37 (S.D.N.Y. Jan 6, 2010). "[T]here is no apparent consensus as to when [a time limit] is required." Zemlyansky, 945 F. Supp. 2d at 454. Like many measures of particularity, the necessity of a temporal limitation depends on the context of the case, as the "complexity and duration of the alleged criminal activities render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates." Hernandez, 2010 U.S. Dist. LEXIS 719, at *37. See also United States v. Costin, No. 05-cr-38, 2006 U.S. Dist. LEXIS 52051, at *12 (D. Conn. July 31, 2006)("A warrant's failure to include a time limitation, where such limiting information is available and the warrant is otherwise wide-ranging, may render it insufficiently particular.").

In this case, only limited categories of evidence authorized to be seized by the warrants did not include an explicit temporal limitation. Of the categories that did not include such a limitation explicitly, two were effectively time-limited as they were limited to evidence relating to the

acquisition of Valspar by Sherwin-Williams, which the supporting affidavit clearly sets forth was initiated in June 2015 and publically announced in March 2016. There was no need for an explicit time limit as the subject matter limitations on seizure effectively limited the time frame concerned.[8]

Therefore, the only categories of evidence to be seized with no temporal limitations were evidence "of transactions conducted or contemplated in Valspar stock" and evidence "regarding the relationship" between the co-defendants and associates. These categories were not overbroad as probable cause clearly justified seizing such evidence without temporal limitation because, as discussed above, evidence of the relationships between tipper and tippee is relevant to determining whether the tipper received a personal benefit in making the tip and evidence concerning past trades in Valspar is relevant to determining whether receipt of inside information motivated the trades at issue.[9]

---

[8] Defendants also argue that these two categories were overbroad in seeking information about "evidence of communications" and "evidence of benefits received or contemplated" by "individuals with access to material non-public information regarding the possible acquisition of Valspar by Sherwin-Williams" without identifying those individuals. See PTMTS at 12; MMTS at 3. However, as discussed above, the limitation to Valspar and Sherwin-Williams references an implicit time limitation that clearly makes these categories sufficiently narrow to fall within the support of probable cause.
[9] Defendants again argue that the warrant, in lacking temporal limitation, was similar to the warrant suppressed in Zemlyansky,

29

Defendants also argue that the warrants were overbroad and lacked particularity in seeking information "regarding the relationship" between Pinto-Thomaz, Millul, and Oujaddou without further specifying the type of evidence required. However, as discussed above, evidence concerning the general tenor of the relationships between tipper and tippees is relevant to proving the requisite personal benefit under Dirks, and as such by its nature cannot be confined to the specific timeframe of the alleged illegal trades. Defendants argue that this constitutes a "catch-all" provision lacking requisite particularity, but the law is clear that "a search warrant does not necessarily lack particularity simply because it is broad." United States v. Ulbricht, 858 F.3d 71, 100 (2d Cir. 2017). As discussed above, the overall relationships between tipper and tippees may be relevant to whether the crime of insider trading has occurred; accordingly, broad search terms are appropriate.

Defendants rely on United States v. Wey, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), for the principle that a search warrant's authorization of seizure of items that "relate to" listed

_____

945 F. Supp. 2d. However, as discussed above, the warrant evaluated in Zemlyansky suffered from extensive flaws that make it by no means comparable to the ones concerned here, and, in that context, the Court found that the failure to include a temporal limitation evinced constitutional deficiency given these other failures, while noting that "there is no apparent consensus as to when [a time limit] is required." Id. at 454.

individuals and entities was an insufficiently particular
limitation; but in the warrant concerned in that case, the
listed individuals and entities included the entity subject to
search and the individuals that owned the premises, so all items
found there could be said to "relate to" them. Id. at 386.[10] This
is clearly inapplicable to the warrants at hand here.

Millul further argues that the authorization to search for
evidence "regarding the relationship, if any" between him and
Oujaddou was unsupported by probable cause because no affidavit
lists any evidence of a relationship between the two. MMTS at 9-
10. However, this is again imposing a higher standard than
required by probable cause. The affidavits set forth evidence
that Pinto-Thomaz was in communication with both Millul and
Oujaddou, as was another relevant person referenced in the
affidavit, so the authorizing judges "look[ing] to the factual
and practical considerations of everyday life on which
reasonable and prudent men act" had ample reason to think there
was a probability that Millul and Oujaddou might have a
relationship. Walczyk, 496 F.3d at 156.

---

[10] Moreover, the warrant in Wey suffered from other fatal flaws,
including failing to identify the suspected crimes or even "in
any way describe any suspected criminal conduct", 256 F. Supp.
3d at 384, and "set[ing] forth expansive categories of often
generic items subject to seizure - several of a catch-all
variety - without, crucially, any linkage to the suspected
criminal activity, or indeed any meaningful content-based
parameter or other limiting principle," id. at 385.

31

Millul also argues that the Millul iPhone Warrant's "failure to specifically list insider trading as the type of securities fraud under investigation" constitutes a lack of particularity, given that the Gmail Warrant identified the crime specifically as "securities fraud/insider trading." MMTS at 29. It is true that particularity requires that the warrant "identify the specific offense for which the police have established probable cause." Galpin, 720 F.3d at 445. As Millul notes, the Second Circuit has stated that "other Circuits have held that even warrants that identify catch-all statutory provisions, like the mail fraud or conspiracy statutes" may be inadequate as these broad statutes "provide[] no limitation at all." Id. at 445 n.5. But quite aside from the fact that the Second Circuit itself has not adopted such a rule, it is irrelevant here since, while securities fraud is susceptible to different theories of proof, it is by no means so broad a statute that it provides no limitation to law enforcement officers in executing a search warrant.

Pinto-Thomaz advances the separate argument that the iCloud warrant was overbroad because it included "intrusive and general categories such as his constant 'geographic location' for an approximate two week period in 2016." PTMTS at 5. However, there is no question that this was supported by probable cause: the two-week period was the one in which he was allegedly

coordinating, at times in person, with Oujaddou and Millul to provide them with material nonpublic information for trading.

In sum, the affidavits set forth detailed information concerning the evidence of insider trading obtained and the connection between the devices and accounts concerned and probable additional evidence. The warrants were particularized and their breadth tied to the evidence relevant to the charges. Moreover, the warrants were reviewed and approved by two different magistrate judges acting independently, which provides a clear presumption of validity. Accordingly, defendants' arguments that the evidence should be suppressed because the warrants lack particularity, are overbroad, and/or lack sufficient probable cause are without merit.

## B. Validity of the Warrants as Executed

"A search must be confined to the terms and limitations of the warrant authorizing it." United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988). Where the executing agents exceed the warrant's authority in the search of their scope, "the normal remedy is suppression and return of those items, not invalidation of the entire search." Id. "[T]he drastic remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms." Id. (emphasis in original). Executing agents are considered to have "flagrantly disregarded" the warrant's

33

terms where "(1) they effect a widespread seizure of items that
were not within the scope of the warrant and (2) do not act in
good faith." United States v. Shi Yan Liu, 239 F.3d 138, 140 (2d
Cir. 2000). "[T]he extreme remedy of blanket suppression should
only be imposed in the most extraordinary of cases." Id. at 142.

Defendants argue that suppression of all evidence resulting
from the warrants is required because agents seized evidence
outside the warrants' limits.

1. Pinto-Thomaz iCloud Warrant

The Government acknowledges that certain items beyond the
scope of the Pinto-Thomaz iCloud Warrant were inaccurately
marked responsive, namely, 143 photos and 146 text files. Govt.
Opp. at 42-43. The Government has agreed not to offer those
items into evidence. Id. In ordinary circumstances, this
commitment suffices to remedy an unauthorized overbreadth in
search, but it is insufficient if the agents acted in "bad
faith" and "flagrant disregard" of the warrant such that the
"the search conducted by government agents [] actually
resemble[d] a general search." Shi Yan Liu, 239 F.3d at 141.

The Court is unable to make this determination absent
evidence concerning how law enforcement agents executed Pinto-
Thomaz iPhone search warrant.[11] Accordingly, the Court directs

[11] In its opposition to defendants' motions for suppression, the
Government makes a number of representations as to how law

counsel for the parties to jointly call Chambers by no later than December 10, 2018, to schedule a suppression hearing to enable the Court to make this assessment.

2. Millul Warrants

In his initial motion for suppression, Millul argued that law enforcement agents exceeded the scope of the warrants for his Gmail Account and iPhone by seizing various nonresponsive emails and text messages and exercising "self-help" in its searches of the iPhone. MMTS at 32-34. In its opposition, the Government acknowledges that it inaccurately marked one contact card from the Millul Gmail Account as responsive, and agrees not to offer this contact card into evidence. Govt. Opp. at 42. The Government otherwise explains why the specific items Millul challenged as outside the scope of the search warrant were, in fact, responsive to it. Id. at 41-42. In his reply, Millul does not renew his arguments for suppression on the ground that law enforcement exceeded the warrants' authority. Accordingly, as the Court has reviewed the Government's justifications for its responsiveness determinations and found them satisfactory and

---

enforcement agents conducted the searches incompliance with warrant terms. However, these representations are made unaccompanied by any sworn affidavits by the agents concerned. Accordingly, the Court is unable to consider them as evidence. See Local Rule 7.1(requiring any factual information necessary for decision on a motion to be in the form of supporting affidavits).

35

finds no indication that law enforcement exceeded the scope of
their authority in executing these search warrants,[12] the Court
will view Millul as having waived this argument and denies
Millul's motion for suppression insofar as it relies on this
ground.

## C. Execution of iPhone Search Warrant

Millul separately argues that the evidence obtained
pursuant to the iPhone search warrant executed subsequent to his
arrest must be suppressed because of law enforcement agents'
actions in questioning Millul concerning his iPhone passcode.
See MMTS at 39.

---

[12] For instance, Millul argued that the executing agents
improperly seized communications subject to confidential marital
communications privilege or attorney-client privilege. See MMTS
at 38-39. "It is axiomatic that the burden is on a party
claiming the protection of a privilege to establish those facts
that are the essential elements of the privileged relationship."
In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224
(2d Cir. 1984). While Millul attempts to assert attorney-client
privilege over a communication with his cousin, an attorney in
Israel, he does not assert that he had an attorney-client
relationship with the cousin or that the communication in
question (a message with a link to the NASDAQ) was a
communication with respect to legal advice. Similarly, the
communication to his wife that Millul seeks to assert
confidential marital privilege over is an email with no content
forwarding a responsive WhatsApp chat, not an "expression[]
intended by one spouse to convey a message to the other" that
qualifies as a confidential marital communication. In re Reserve
Fund Sec. & Derivative Litig., 275 F.R.D. 154, 157 (S.D.N.Y.
2011). Millul's "self-help" argument, see MMTS at 34, is totally
meritless, as the warrants did not include specific search
strings that law enforcement were required to use in searching
for responsive evidence.

It is uncontested that, after his arrest, Millul was read his Miranda rights and waived his right to counsel before answering various law enforcement questions. See Federal Bureau of Investigation Advice of Rights, Ex. G, Govt. Opp., Dkt. 67-6; June 26, 2018, Millul FBI Interview Transcript, Ex. F, Govt. Opp, Dkt. 67-5 ("FBI Transcript"). It is similarly uncontested that, at the conclusion of the interview, Millul raised questions about the process for obtaining counsel at Pretrial Services, then got into a car with law enforcement agents to be driven to Pretrial Services. See FBI Transcript; Govt. Opp. at 19; Declaration of Jeremy Millul in Support of Motion to Suppress, Dkt. 46("Millul Dec."), ¶ 4. During this car ride, Millul claims, see Millul Dec. ¶ 4, and the Government denies, see Govt. Opp. at 19, that he invoked his right to counsel.

After this alleged request for an attorney, upon arrival at Pretrial Services, law enforcement agents told Millul that they had a search warrant for his phone, and that that search warrant gave them permission to use the FaceID feature to unlock the phone if Millul did not provide his passcode.[13] Millul Dec. ¶ 7;

---

[13] The iPhone Warrant provides that "[d]uring the execution of this warrant, law enforcement personnel are authorized to hold the Subject Device in front of Jeremy Millul's face to activate the FaceID sensor." Millul iPhone Warrant, Att. A, Ex. H, Govt. Opp., Dkt. 67-7. The affidavit accompanying the warrant, in a section entitled "Accessing ESI," further provides as follows:

Govt. Opp. at 23. Millul then provided the passcode, which Special Agent Anderson used to unlock the phone and execute the warrant. Millul Dec. ¶ 8; Govt. Opp. at 23.

The Government argues that a suppression hearing as to whether Millul invoked his right to an attorney is unnecessary as, even if Millul had invoked his right to counsel prior to being questioned concerning the passcode, only the passcode, and not the evidence obtained through its use, would be properly suppressed. Govt. Opp. at 48. However, the law in this area is not as clear as the Government represents. The Supreme Court in United States v. Patane, 542 U.S. 630, 634 (2004) (plurality opinion), held that, in the context of a failure to finish providing Miranda warnings after an interruption by the suspect attempting to waive the Miranda recitation, "suppression of the physical fruits of the suspect's unwarned but voluntary [nontestimonial] statements" was not required. The Court has made no such holding as regarding failure to end an

---

> At the time the agents execute the requested warrant, they will ask Millul for the passcode or password for the Subject Device. If he refuses to provide the password or passcode, I request that the Court authorize law enforcement to hold the seized device in front of Millul's face for the purpose of attempting to unlock the device via Face ID in order to search the contents as authorized by this warrant.

Ex. H ¶ 25.

38

interrogation after a defendant has asserted a Miranda right to counsel in violation of Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (holding that "when an accused has invoked his right to have counsel present during custodial interrogation...[he] is not subject to further interrogation by the authorities until counsel has been made available to him"). The Government argues that the same result should apply to an Edwards violation, citing the Fifth Circuit's decision in United States v. Gonzalez-Garcia, 708 F.3d 682 (5th Cir. 2013), denying suppression of seized marijuana as "the fruit of an Edwards violation," but the court there specifically found suppression unjustified in that instance "[b]ecause the marijuana seized is physical, nontestimonial evidence," unlike "opening the combination locks" of a case, which the court had held in a previous case to be "testimonial and communicative in nature" as it "disclosed...the means of opening these cases." Id. 686-87 (discussing in part United States v. Green, 272 F.3d 748 (5th Cir. 2001)). Several courts to consider the issue have specifically held that asking a suspect to enter his phone passcode after the suspect has requested an attorney is an Edwards violation requiring suppression of the contents of the phone. See United States v. Gilkeson, 431 F. Supp. 2d 270 (N.D.N.Y. 2006); United States v. Mitchell, 76 M.J. 413

(C.A.A.F. 2017) (relying in part on the Military Rules of Evidence).

Accordingly, the Court finds that a suppression hearing as to whether Millul in fact invoked his right to counsel prior to being questioned concerning his iPhone passcode is warranted. The Court directs counsel for the parties to jointly call Chambers by no later than December 10, 2018, to schedule the hearing.

## IV. Motions for Return of Property

Rule 41 of the Federal Rules of Criminal Procedure provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). "The Rule recognizes that federal courts have equitable jurisdiction to order the return of property." Bertin v. United States, 478 F.3d 489, 492 (2d Cir. 2007). This jurisdiction encompasses both ordering the return of physical property and ordering "the destruction of copies of records" in some circumstances. In re A Warrant for All Content & Other Info. Assoc. with the Email Account xxxxxxx@Gmail.com Maintained at Premises Controlled by Google, Inc., 33 F. Supp. 3d 386, 398 (S.D.N.Y. 2014) (discussing the Advisory Committee notes to Rule 41(g)). In order to prevail on a Rule 41(g) motion, the moving party "must demonstrate that (1) he is entitled to lawful possession of the seized property; (2)

the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended." Ferreira v. United States, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005).

## A. Pinto-Thomaz Motion

Pinto-Thomaz moves for the return of his iPhone, which was seized at the time of his arrest on July 9, 2018. See Memorandum of Law in Support of Sebastian Pinto-Thomaz's Motion for Return of Property, Dkt. 42 ("PT MFR"), at 1. Since that time, the Government has been unable to execute the search warrant as the phone is locked and passcode-protected, Pinto-Thomaz has refused to provide the passcode, and the Government has been unable to break the encryption. See PT MFR at 1; Govt. Opp. at 58. Pinto-Thomaz argues that the phone must be returned on the ground that the time for executing it has expired, either because the deadline for execution listed on the face of the warrant has passed or because a reasonable amount of time for execution has passed. See PT MFR at 2-3. Both of these arguments are unavailing.

Rule 41 of the Federal Rules of Criminal Procedure provides that a search warrant must be executed "within a specified time no longer than 14 days" from the date of its issuance. Fed. R. Crim. P. 41(e)(2)(A). See also United States v. Marin-Buitrago, 734 F.2d 889, 894 (2d Cir. 1984) (holding that Rule 41 "mandates

41

that a search warrant must be executed" within the provided time frame). However, Rule 41 is clear that, for warrants seeking electronically stored information, "[t]he time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Fed. R. Crim. P. 41 (e)(2)(B) (emphasis added). The Advisory Committee notes explain that "the practical reality is that there is no basis for a 'one size fits all' presumptive period" for reviewing electronically-stored media, and that therefore, absent a separate judicially-imposed deadline, Rule 41 does not "impos[e] a deadline for the return of storage media." Fed. R. Crim. P. advisory committee's note. The Pinto-Thomaz iPhone search warrant, approved by Magistrate Judge Fox on June 25, 2018, commanded the agents "to execute this warrant on or before July 9, 2018," two weeks from the date it was signed. See Mazurek Declaration in Support of Motion to Return Property, Ex. A, Dkt. 37("iPhone Warrant"). Law enforcement seized the iPhone at the time of Pinto-Thomaz's arrest on June 26, 2018. Therefore, the seizure was compliant with Rule 41 and the timeline authorized by the warrant.

The Fourth Amendment separately requires that law enforcement "must execute a search warrant within a reasonable time." United States v. Lustyik, 57 F.Supp.3d 213, 230 (S.D.N.Y. 2014). The Second Circuit has viewed the advisory committee'

notes to the 2009 amendment of the Federal Rules of Criminal Procedure as "shed[ding] some light on what is reasonable" in the context of electronic data review, noting the advisory committee specifically provides that factors such as "difficulties created by encryption" "might justify an off-site review lasting for a significant period of time." United States v. Ganias, 755 F.3d 125, 136 (2d Cir. 2014). This direction is consistent with the affidavit presented to the Magistrate Judge in authorizing the iPhone warrant stating that "Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses." iPhone Aff. ¶ 29.

Therefore, contrary to Pinto-Thomaz's arguments, the Government has not exceeded any constitutional or Rule 41 deadline for concluding its search of the iPhone given the difficulties posed by encryption.[14] The Government has only

---

[14] The cases that Pinto-Thomaz cites for the principle that a reasonable period for execution of the search warrant "has long since lapsed" are all clearly inapposite. See PT MFR at 3; PT Reply at 7. United States v. Ramirez, 523 U.S. 65, 71 (1998), concerns the reasonableness of a "no-knock" entry to execute a search warrant. United States v. Ganias, 755 F.3d 125, 137 (2d Cir. 2014) found the time for reviewing computer files unreasonable where the Government retained copies of computer files "for two-and-a-half years" without a probable cause basis for their search or retention "while it looked for other

possessed the iPhone in question for a matter of months at this point, hardly a constitutionally significant period of time given the encryption difficulties. See United States v. Metter, 860 F.Supp.2d 205, 215 (E.D.N.Y. 2012) ("Numerous cases hold that a delay of several months between the seizure of electronic evidence and the completion of the government's review...is reasonable"). And the Government further represents that it continues to need the iPhone for its preparation for trial and continues to seek to de-encrypt the iPhone as it accesses new technology. See Govt. Opp. at 58-59. "Retention of evidence by the government is proper if the property is needed in an investigation or prosecution," unless these "interests can be satisfied even if the property is returned." United States v. Pearson, No.04-cr-340, 2006 U.S. Dist. LEXIS 32982, *43-44 (N.D.N.Y. May 24, 2006). As the Government has been unable to access and image the contents of the iPhone, its interests would be sacrificed by the phone's return.

---

evidence to give it probable cause to search the files." The Government has only possessed the iPhone in question for a matter of months at this point. Lustyik, 57 F. Supp. 3d at 230, concerned Government retention and subsequent review and re-coding of emails marked as "not relevant" in an initial review. Finally, United States v. Metter, 860 F.Supp.2d 205, 215 (E.D.N.Y. 2012), stands for the principle that the Government may not retain electronic data "with no plans whatsoever to begin review of that data," not that the Government may not retain data where encryption impedes its efforts to begin review.

Accordingly, as Pinto-Thomaz has failed to meet his burden of showing that retention of the iPhone is illegal or that he is entitled to the iPhone's return, his motion is denied.

## B. Millul Motion

Millul moved for the return of all data seized pursuant to the Millul Gmail and Millul iPhone Warrants, although, in his reply briefing, he modified this motion to a request for a Court order that parties "attempt to negotiate a solution to the 41(g) issues." MMTS at 42; M Reply at 17.[15] Millul argues, at least in his initial briefing, that all seizures pursuant to the Millul Gmail Warrant and Millul iPhone Warrant were illegal and that therefore all materials seized pursuant to them should be returned. MMTS at 42-43. As discussed above, these searches and seizures pursuant to the Millul Gmail Warrant were not illegal. Accordingly, the motion as to the return of information seized pursuant to this warrant is denied. The Court reserves judgment on Millul's motion as to the evidence obtained pursuant to the

---

[15] In his reply, Millul also requests that the Court issue an order "preclud[ing] the government from accessing or reviewing any of the material it admits is non-responsive." M Reply at 17. However, such an order is unnecessary as the search warrants already constitute limits on the Government's authorization to review non-responsive material, and the Government has already affirmatively agreed not to offer into evidence the one contact card that it incorrectly marked as responsive in the Millul Gmail Account. See Govt. Opp. at 42.

45

Millul iPhone Warrant pending its decision following the
suppression hearing ordered above.

## V. Conclusion

In conclusion, Pinto-Thomaz's and Millul's motions to
dismiss the indictment are denied. The motion for a bill of
particulars is granted insofar as the Government is directed to
identify any known unindicted co-conspirators, but is otherwise
denied. Millul's motion to suppress evidence obtained pursuant
to the Millul Gmail Warrant is denied. Pinto-Thomaz's motion for
the return of his iPhone is denied. Millul's motion for the
return of the information obtained pursuant to the Millul Gmail
Warrant is denied, but the Court reserves judgment on Millul's
motion for the return of the information obtained pursuant to
the Millul iPhone Warrant pending its decision following the
suppression hearing related to that device. Counsel are directed
to jointly call Chambers by no later than December 10, 2018, to
schedule suppression hearings as to the Pinto-Thomaz iCloud
Warrant and the Millul iPhone Warrant.

The Clerk of Courts is directed to close docket numbers 35,
38, 41, 44, 48, and 50.

SO ORDERED

Dated:    New York, NY
          December **6**, 2018                    JED S. RAKOFF, U.S.D.J.

46