UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :
                                    :
        -v-                         :
                                    :
SEBASTIAN PINTO-THOMAZ and          :
JEREMY MILLUL,                      :
                                    :
        Defendants.                 :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE: ᒿ/ᒿ0/10

S2 18-CR-579 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

By Opinion and Order dated December 6, 2018 ("Op."), the
Court resolved a number of pretrial motions filed by defendants
Sebastian Pinto-Thomaz and Jeremy Millul; but the Court reserved
judgment, pending a suppression hearing, as to (1) Mr. Pinto-
Thomaz's motion to suppress evidence obtained pursuant to a
warrant for his Apple iCloud account and (2) Mr. Millul's motion
to suppress evidence obtained pursuant to a warrant for his
iPhone. See Dkt. 75. Having now held a suppression hearing and
received additional post-hearing briefing from the Government
and both defendants, the Court, for the reasons stated below,
denies both motions to suppress.

Familiarity with the underlying facts and all prior
proceedings is herein assumed.

I.    **Pinto-Thomaz Motion to Suppress**

Pinto-Thomaz initially moved to suppress all evidence
seized by the Government pursuant to a search warrant for his

1

Apple iCloud storage account (hereinafter, the "iCloud" and "iCloud warrant") on the grounds that the warrant was invalid as issued, or, in the alternative, that the executing agents failed to abide by the constraints of the warrant. See Memorandum of Law in Support of Sebastian Pinto-Thomaz's Motion to Suppress Items Seized Pursuant to the Apple iCloud Search Warrant, Dkt. 39 ("PT Mem. 1"); Reply Memorandum of Law in Support of Sebastian Pinto-Thomaz's Motion to Suppress Items Seized Pursuant to the Apple iCloud Search Warrant, Dkt. 72 ("PT Rep. 1"). In its previous opinion, the Court found Pinto-Thomaz's argument that the warrant was invalid as issued without merit, but reserved judgment, pending a suppression hearing, as to whether the executing agent's seizure of certain items beyond the scope of the warrant constituted ground for suppression of all items seized pursuant to the warrant. Op. at 33-35. Following the suppression hearing, Pinto-Thomaz filed additional briefing in support of his argument for blanket suppression of all items seized. See Post-Hearing Memorandum in Further Support of Sebastian Pinto-Thomaz's Motion to Suppress Items Seized Pursuant to the Apple iCloud Search Warrant, Dkt. 92 ("PT Mem. 2"), Dkt. 92; Defendant Sebastian Pinto-Thomaz's Post-Hearing Reply Brief ("PT Rep. 2"), Dkt. 97.

2

### A. Factual Findings

Based on the Court's assessment of the testimony presented at the suppression hearing – including assessments of the witnesses' credibility and demeanor – the Court makes the following findings of fact:

Magistrate Judge Peck issued a search warrant for Pinto-Thomaz's iCloud account in January 2018. See Govt. Ex. 5 (iCloud Warrant). The warrant as issued contained an apparent internal inconsistency in its text. Section II of the warrant, which is titled "Information to be Produced by the Provider," directs the Provider to produce message content for only the limited "period between March 8, 2016 and March 20, 2016." Id. § II(a). Section II places no time limitations on any other categories of information to be produced (for instance, "other stored electronic information" is defined to include "[a]ll records and other information stored by the Subject Account's user"). Id. § II, § II(d). Section III of the warrant, entitled "Review of Information by the Government," places the March 8, 2016 to March 20, 2016 time limitation only on (1) evidence related to the iCloud user's geographic location and (2) evidence related to in-person meetings involving the defendants. Id. § III(e), (j). The other categories of evidence listed in Section III are defined by subject matter without any time limitation whatsoever. Id. § III. Some of the categories without a time

3

limitation would seem to naturally encompass message content
(ex. "evidence of communications regarding Sherwin-Williams and
Valspar"). Id. § III(a).

Special Agent Jordan Anderson of the Federal Bureau of
Investigation ("FBI"), who submitted an affidavit in support of
the warrant application, reviewed the warrant before it was
signed but did not notice that Section II contained a date
restriction as to message content. Tr. 107:19-108:1; 205:12-
206:12. Anderson served the warrant on Apple but did not have
any discussions with Apple concerning the warrant's terms or
Apple's production obligations. Id. 152:22-153:7. In response to
the iCloud Warrant, Apple produced messages outside of the scope
of the time limit for message content contained in Section II.
Id. at 152:12-16. Upon receipt of production from Apple,
Anderson turned the material over to a different unit in the FBI
to be uploaded into a system that allowed for law enforcement
review. Id. 107:5-18.

Anderson subsequently reviewed the furnished materials. He
had no prior experience conducting such a review, although he
had received training. Id. 132:12-19. In completing his review
of Apple's production, Anderson referred to Section III of the
warrant ("Review of Information by the Government"), but not
Section II, which he viewed as relevant primarily to the
provider and not to his review because of its title,

4

"Information to be Produced by the Provider." Id. 205:10-206:16, 148:6-13. Accordingly, Anderson seized some messages that were outside the time limitation of Section II, but consistent with the limits of Section III.

Anderson initially completed his review, marking items as responsive pursuant to the constraints of Section III, which he recognized as "dictat[ing]" what could be seized. Id. 108:2-20; 110:2-10. Then, following a conversation with the AUSA handling the case, Anderson came under the false impression that he had misunderstood the terms of Section III as more limited than they really were. Anderson understood from this conversation that anything between March 1, 2016 and June 30, 2016 would be "pertinent," which he understood to mean responsive to the warrant. Id. 110:15-111:19. Anderson reconciled his understanding of this conversation with the terms of the warrant upon re-review of the warrant by concluding that, while he had (correctly) viewed the categories of information to be seized in Section III as an inclusive list, it was actually a non-inclusive list providing examples of items that could be seized but not limiting law enforcement just to those specific items. Id. 180:7-183:17 (discussing how the warrant uses the word "including" to signify both inclusive and non-inclusive lists). Accordingly, Anderson marked as responsive all items with a creation date between March 1, 2016 and June 30, 2016. Id.

5

110:19-111:6. Anderson then concluded his review. Id. 111:22-24. Throughout the review, Anderson kept a diary of his searches, including the final, erroneous search. Id. 112:11-15; Govt. Ex. 10(Anderson notes).

Later, after receipt of Pinto-Thomaz's motion to suppress, Anderson conducted a "re-review" of the materials marked responsive based on his original understanding of the warrant, which he by then understood to be accurate. Tr. 114:3-115:14. The files found to be improperly marked as responsive were within the March 1, 2016 through June 30, 2016 timeframe, and their seizure had resulted from Anderson's inaccurate understanding after his conversation with the AUSA. Id. 115:8-17. As for Section II, Anderson was first notified of the time limitation in Section II a few days before the suppression hearing and believes that it was a "typo," as the Government did not intend to apply a date limitation to that category of messages. Id. 205:6-17; 206:16-21.

The Court found Anderson's testimony entirely credible.

**B. Discussion**

"A search must be confined to the terms and limitations of the warrant authorizing it." United States v. Matias, 836 F.2d

744, 747 (2d Cir. 1988).[1] However, "[e]ven where a search or seizure violates the Fourth Amendment, the Government is not automatically precluded from using the unlawfully obtained evidence in a criminal prosecution." United States v. Ganias, 755 F.3d 125, 136 (2d Cir. 2014). Exclusion "has always been our last resort, not our first impulse," and "applies only where it results in appreciable deterrence" - in other words, where police conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 140-41, 144 (2009).

Where the executing agents exceed the warrant's authority in the scope of their search, "the normal remedy is suppression and return of those items, not invalidation of the entire search." Matias, 836 F.2d at 747. "[T]he drastic remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms." Id. (emphasis in original). Executing agents are considered to have "flagrantly disregarded" the warrant's terms where "(1) they effect a widespread seizure of items that were not within the scope of the warrant and (2) do not act in

---

[1] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

good faith." United States v. Shi Yan Liu, 239 F.3d 138, 140 (2d Cir. 2000). A "widespread seizure of items" outside of the warrant's scope occurs when the Government's search "resemble[s] a general search." United States v. Ganias, 755 F.3d 125, 136 (2d Cir. 2014). The executing agents act in good faith "when they perform searches in objectively reasonable reliance on binding appellate precedent." Id.

The Court must also weigh "(3) the benefits of deterrence against (4) the costs of suppression." Id. at 140. "[E]vidence will be suppressed only where the benefits of deterring the Government's unlawful actions appreciably outweigh the costs of suppressing the evidence." Id., at 136-37. And "the extreme remedy of blanket suppression should only be imposed in the most extraordinary of cases." Liu, 239 F.3d at 142.

The Government has already agreed not to offer into evidence either the messages seized outside of the date limitation of Section II of the warrant or the 143 photos and 146 text files seized outside of the scope of Section III. See Government's Post-Hearing Memorandum of Law in Connection with Defendants' Motions to Suppress Evidence ("Gov't Mem. 2"), Dkt. 91, at 31 n.4; Government's Memorandum of Law in Opposition to the Defendants' Pretrial Motions ("Govt. Mem. 1"), Dkt. 67, at 42-43. Accordingly, the only remaining question is whether this exclusion is adequate, or whether the warrant's executing agent

8

acted in "flagrant disregard" of the warrant's terms such that blanket suppression is warranted.

The Court finds no ground for imposing the "extreme remedy" of blanket suppression here. The executing agent did not "grossly exceed" the terms of the warrant, which generally authorized widespread seizure of a number of broadly defined categories of evidence. See Liu, 239 F.3d at 141-42 (considering the breadth of the warrant as relevant to whether a general search was conducted). The executing agent undertook and thoroughly documented a "fairly systematic inventory" to search for the items enumerated in the warrant, erring only in failing to notice an internal inconsistency in the warrant and then, at a later point in the execution of the warrant, misinterpreting the warrant's terms to allow for what was in fact an unauthorized seizure of items from four months (which encompassed the time period of the alleged crime). Id. While these were errors, and ones that resulted in the seizure of a number of individual items outside the warrant's scope, this was not "an indiscriminate rummaging" throughout the iCloud account. Id.

The Court finds little, if any, deterrence value in suppressing the entire warrant in these circumstances. As discussed above, the Supreme Court has stressed that exclusion is appropriate only where conduct is "sufficiently deliberate

9

that exclusion can meaningfully deter it, and sufficiently

culpable that such deterrence is worth the price paid by the

justice system." Herring, 555 U.S. at 144. Pinto-Thomaz argues

that Anderson's conduct did not meet an objective standard of

good faith reasonableness, but the Court believes that

Anderson's errors are adequately addressed in this instance by

excluding the items improperly seized. Specifically, the Court

finds that there is no evidence here that the errors were

deliberate.[2] Rather, Anderson's errors were committed in what

---

[2] Pinto-Thomaz argues at length that Anderson deliberately
violated the warrant's terms. It was this allegation that
prompted the Court to hold a suppression hearing. But, having
done so, the Court finds that the allegation of deliberate bad
faith is unsupported by any evidence in the record.
Specifically, Pinto-Thomaz argues that Anderson "deliberately
ignored" Section II's date restriction and "stepped into the
place of the magistrate judge" by substituting his own
preferences concerning what the warrant should read. PT Mem. 2
at 13-14. But, contrary to Pinto-Thomaz's interpretation of the
hearing testimony, see PT Mem. 2 at 9, Anderson did not testify
that he realized there was a date limitation in Section II,
viewed it as a typo, and independently decided to ignore it and
execute the warrant as he thought it should read. Rather, as
discussed above, Anderson testified that he failed to notice the
date limitation in his initial review of the warrant and
subsequently relied only on Section III, becoming aware of the
date limitation in Section II only shortly before the hearing on
the instant motion. Pinto-Thomaz also argues that Anderson knew
seizure of all items between March 1 and June 30, 2016, was
"contrary to the terms of the iCloud Warrant." PT Mem. 2 at 13.
But Anderson testified extensively about his mistaken
understanding that the seizure was consistent with the warrant,
based on the warrant's inconsistent use of the word "including"
to signify both inclusive and non-inclusive lists. Moreover,
this error was hardly a "shortcut[] to get the results []
wanted," PTM Mem. 2 at 17, as the search warrant already
provided broad authorization for seizure of relevant evidence

10

appears to have been a diligent, if at moments misguided, effort
to comply with the warrant's terms by an officer executing his
first electronic search warrant. See id. at 145 (considering "a
particular officer's knowledge and experience" as relevant to an
objective good faith inquiry). After carefully evaluating
Anderson's testimony and credibility, as well as all the facts
of record, the Court concludes that there is simply no evidence
of any deliberate violations of the warrant or extraordinary
facts that would require the unusual imposition of blanket
suppression, as opposed to the already-conceded exclusion of the
wrongfully-seized evidence.

In conclusion, Pinto-Thomaz's motion to suppress all
evidence obtained pursuant to the iCloud warrant is denied.

---

and Anderson's mistaken alteration simply swept in irrelevant
material to be rereviewed and removed later. In short, the
record is devoid of evidence of deliberate evasion. This
distinguishes the instant case from the cases cited by Pinto-
Thomaz where courts found that the executing agents knowingly
violated the warrants there concerned. See United States v.
Voustianiouk, 685 F.3d 206, 215-16 (2d Cir. 2012) (suppression
warranted where court found that officers "knowingly" searched
an entirely different apartment than the warrant authorized and
"deliberately withheld information the magistrate judge who
granted the warrant"); see also United States v. Bershchansky,
958 F.Supp.2d 354, 381 (E.D.N.Y. 2013) (suppression warranted
where officers searched an entirely different apartment than the
one listed in the warrant and made false statements in the
warrant application).

## II. **Millul Motion to Suppress**

Millul has moved to suppress all evidence obtained pursuant
to a search warrant for his iPhone, executed subsequent to his
arrest, on the ground that the method of its execution violated
his Fifth and Sixth Amendment rights to counsel. See Defendant
Jeremy Millul's Motion to Suppress and for the Return of
Property ("Mill. Mem. 1"), Dkt. 45; Defendant Jeremy Millul's
Reply Memorandum of Law in Support of Motions to Suppress, for
the Return of Property, to Dismiss and for a Bill of Particulars
("Mill. Rep. 1"), Dkt. 70. In its prior opinion, the Court
ordered a suppression hearing as to whether Millul in fact
invoked his Fifth Amendment right to counsel prior to being
questioned concerning his iPhone passcode. Op. at 40. Following
the hearing, Millul submitted supplemental briefing in support
of this motion. See Defendant Jeremy Millul's Post-Hearing
Memorandum of Law in Further Support of Motion to Suppress
("Mill. Mem. 2"), Dkt. 90; Defendant Jeremy Millul's Post-
Hearing Reply Memorandum of Law in Further Support of Motion to
Suppress ("Mill. Rep. 2"), Dkt. 96.

### A. **Factual Findings**

Once again, the Court, after careful evaluation of the
witnesses' testimony – including their credibility and demeanor
– makes the following findings of fact:

12

Millul was arrested at his apartment at approximately 6:00am on June 26, 2018 by FBI agents. Tr. 6:23-24, 85:08-12, 39:16-23; Govt. Ex. 1 (Arrest Log). The arresting officers seized his cellphone in the process of this arrest. Tr. 39:13-14, 39:24-40:04, 239:14-15. Although, Millul testified that he told his wife, "I think you should get me a lawyer," before leaving the apartment, id. 243:5-10, this testimony, offered for the first time on cross-examination is doubtful, and, in any event, Millul did not testify that he made this request for a lawyer to any arresting agent. FBI Agents Nicholas Swanson, Todd McGee, and Zachary Carroll, who were all present at the arrest, all testified that Millul did not inform law enforcement that he wanted to speak to an attorney while they were in the apartment, id. 8:1-3, 40:10-12, 86:13-17, and the Court finds their testimony fully credible.

Swanson read Millul his Miranda rights during the car ride from Millul's apartment to the FBI office. Id. 9:9-16; 41:6-42:3. Millul testified that he understood his Miranda rights when they were read, and that he did not respond that he did not want to answer questions without a lawyer present. Id. 234:11-233. Swanson testified that, during the car ride, Millul indicated that he was willing to speak with the FBI. Id. 42:12-14.

Millul testified on direct examination that he asked to make a phone call during this car ride and was told that he had no right to do so. Id. 234:21-235:5. On cross-examination, Millul testified that he had specified that he wanted to make the phone call in order to get a lawyer. Id. 243:17-244:6. Two of the three law enforcement agents present in the car, Swanson and McGee, testified that Millul did not say that he wanted an attorney during this car ride. Id. 9:13-21; 42:4-11. The third, Carroll, testified that he did not recall any specifics concerning the car ride. Tr. 86:18-22. The Court does not credit Millul's assertion on cross-examination that he asked for an attorney during the car ride to the FBI - an assertion that he did not make on direct examination or in his declaration submitted prior to the hearing, and that was contradicted by the testimony of two agents whom the Court finds credible.

The interview at the FBI office was videotaped and a transcript of the resultant tape introduced at the suppression hearing. See Govt. Ex. 2 (video recording of FBI interview); Govt. Ex. F (transcript of FBI interview) ("FBI Tr."). At the FBI office, Millul was again read his Miranda rights, and he reviewed and signed an advice of rights form, waiving his rights. Tr. 244:24-245:3; Govt. Ex. 3 (Millul waiver of rights form); Govt. Ex. F. at 2. Millul testified at the suppression hearing that he had understood his rights after they were read,

14

and had no questions concerning them. Tr. 245:4-7. Millul

proceeded to answer the FBI agents' questions. Id. 245:8-246:8.

At three points during the interview, Millul mentioned

obtaining counsel. The first such exchange was as follows:

SWANSON: Okay. And where did you overhear that a merger
was going to happen?

MILLUL: That is something I want to talk to my lawyer
about, because I don't want to put somebody in a
bad spot. But it's nobody's fault.

SWANSON: Okay.

MILLUL: It's nobody's fault. I traded on my own without
anybody's getting any money for anything. I
didn't know it was insider trading. I'm not
particularly -- I don't have any information. I
don't work for any companies.

SWANSON: Okay.

MILLUL: I thought it was my luck. No? I don't know. You
guys tell me. Is that insider trading?

SWANSON: Well, I guess if you go into more specifics, you
know, I can kind of speak to you a little bit
more. But if you're saying you just overheard it
and you don't want to go into that aspect of it
and you're asking for an attorney, then I can't
go any further into that.

MILLUL: I overheard it once when I was at Sebastian's
mom's house.

SWANSON: Okay, so just to clarify real quick. Do you --
would you like an attorney, or no?

MILLUL: I want to try to understand. You guys, I'm a
father. I thought I was, I thought I got lucky.
You guys have to listen to me. I don't want to
get into -- I don't want to get anybody into
trouble.

15

SWANSON:    No, listen. That's a noble -- a very noble
            thing.

MILLUL:     Nobody got money here. There's no money
            exchanged. There was -- I asked him for advice,
            maybe once or twice, like I asked my neighbor
            for advice, like I ask everybody who works in
            finance for advice. But I need to understand,
            I'm not -- I don't work in this industry to
            understand. I thought this was --when I made my
            research, I thought this was not insider
            trading. No?

SWANSON:    Okay. Just so -- just to -

MILLUL:     I just gave you the answer.

SWANSON:    No, definitely. But for a firm yes or no, you
            don't want an attorney then, correct? Right now
            you want to continue speaking so we can speak
            about this?

MILLUL:     What -- I don't know, guys. Come on. I don't
            (UI) want to go to jail. So, if I need to get an
            attorney, then you get an attorney.

SWANSON:    No. I just need -- because we can continue
            talking and we can go further if you do not wish
            to have an attorney right now. But you brought
            the fact that you wanted an attorney, didn't
            want to talk about something. So, therefore, if
            you want -

MILLUL:     Fine, I don't want an attorney.

SWANSON:    Okay, okay. Just wanted to make that sure -
            clear.

FBI Tr. at 11-13. At the suppression hearing, Millul confirmed

that that he had knowingly chosen to continue with questioning

at this point in the interview. Tr. 262:14-16.

16

The next exchange occurred after Swanson told Millul that he was being charged with securities fraud for insider trading activity:

MILLUL:     So, I think I should get a lawyer now.

SWANSON:    Okay, so --

MILLUL:     I think I should, right?

SWANSON:    That's completely up to you.

MCGEE:      We can't give you that advice.

SWANSON:    That's why there's always an affirmative yes or an affirmative no.

MILLUL:     All right, let's go, let's go.

SWANSON:    So, you don't want an attorney?

MILLUL:     That's fine. If I did something wrong, I'll go through, I'll go whatever I have to.

FBI Tr. at 16-17. At the suppression hearing, Millul testified that in this second exchange, he was initially invoking his right to counsel, but that he changed his mind and chose to continue with the interview. Tr. 263:20-265:5. Millul testified that he wanted to continue the interview because his "impressions were that this would clear up if I explained to them what happened." Id. 264:25-265:1. Millul also testified that he understood at the time of the interview that he had the right to stop answering questions at any time. Id. 261:7-15.

17

At the conclusion of the interview, Millul asked, "when I get to pretrial, am I going to get a lawyer?" Id. 235:22-24. The agents explained that a lawyer would be appointed for him if he did not have the means to hire one, based on Pretrial Services' financial assessment. Millul stated, "I have means." FBI Tr. at 37. At the suppression hearing, Millul testified that he believed that "pretrial had to make that determination" as to his financial status before he could retain a lawyer on his own. Tr. 265:25 -266:7. Millul explained that at no point did the agents represent that he "was not allowed" to hire an attorney before going to pretrial services but that they did tell him that they "had to go to pretrial services." Id. 249:4-11; 257:15-16. The Court does not find Millul's assertion that he believed he could not retain counsel before going through Pretrial Services credible. As discussed above, Millul was informed of his rights multiple times, and testified that he understood that he had the right to an attorney and could invoke it at any time. Moreover, he did invoke his right to counsel at one point in the interrogation before changing his mind, thereby evidencing his awareness of his ability to do so.

Millul was then transported in a car from the FBI office to the courthouse. Id. 236:3-11. Millul was asked no substantive questions concerning the case during this car ride. Id. 252:7-9. McGee testified that, during this car ride, he went over the

18

process for the rest of the day with Millul, including the meeting with Pretrial Services and how Pretrial Services would analyze whether Millul could be provided with an appointed attorney, and that Millul, in response, "indicated that he was independently wealthy and he would not need a government-appointed attorney." Tr. 17:23-18:25. McGee recalled Millul being primarily concerned with how long the process would take before he could go home. Id. McGee testified that at no point during the car ride did Millul say anything indicating that he was seeking the present assistance of counsel. Id. 20:24-21:10; 34:20-35:7. Millul testified that, in response to McGee's description of the pretrial services process, he said that he "had the means" and "wanted a lawyer." Id. 237:3-6. Millul testified that he did not specify that he wanted a lawyer for a specific point in the day or for before answering further questions. Id. 252:10-24. Millul also represented in his declaration filed in support of his pre-hearing motions that he requested an attorney during this car ride. See Declaration of Jeremy Millul in Support of Motion to Suppress, Dkt. 46.

The Court credits McGee's testimony concerning this exchange, which diverges only slightly from Millul's, as Millul acknowledges that the mention of an attorney occurred in the context of a discussion concerning the Pretrial Services process and the schedule for the day and that he had expressed concern

19

about the length of time required for processing. Notably, Millul does not state that he made the alleged request for counsel in response to any substantive question or even the discussion of his iPhone passcode. In this context, the Court does not find Millul's testimony credible that he made a request for the present assistance of counsel, rather than merely representing his plans to hire his own attorney.

The subject of Millul's phone passcode came up twice between the end of the FBI interview and Millul's arrival at Pretrial Services. In the car on the way to the courthouse, Millul asked for his cell phone back from the FBI agents. Tr. 236:12-16. The FBI agents responded that they needed to copy the phone before returning it and would need Millul's passcode to do so. Id. 236:17-22; 250:21-25. Millul did not provide the passcode. Id. 236:23-24. Then, while waiting in the courthouse parking lot, an FBI agent asked Millul to provide his passcode to enable the agent to put the phone in airplane mode. Id. 237:15:24. Millul again refused to provide the passcode, instead instructing the agent as to how to put the phone in airplane mode without unlocking it. Id. 237:25-238:16.

No substantive questions concerning the case were asked during Millul's subsequent time at Pretrial Services. Id. 255:11-256:11, 258:9-11. After Millul's interview with Pretrial Services had concluded, but while they were still at the

20

Pretrial Services office, Swanson informed Millul that his wife had just called the FBI hotline, and Millul asked Swanson to "call her back and tell her I need a lawyer, a securities fraud lawyer." Tr. 239:1-17; 259:3-7. Swanson called Millul's wife, in Millul's presence, and told her that Millul wanted a lawyer. Id. 239:18-22; 259:12-16. Millul yelled in the background of the call to "make sure she knows I want a securities fraud lawyer." Id. 239:23-240:2; 259:14-16.

Swanson initially testified that he recalled Millul saying that he "wished to hire an attorney for the initial appearance later that day." Id. 55:10-13; 56:9-15. On cross-examination, Swanson testified that while he recalls that Millul conveyed that the attorney was for the court proceeding later that day, he does not recall the words that Millul used that gave Swanson this impression. Id. 58:25-61:15. Swanson testified that he did not understand Millul's request to be an attempt to invoke the right to have counsel present such that he did not want to answer further questions without an attorney present, as Swanson was not asking him any questions at the time. Id. 56:9-21.

Millul testified that he placed no time limitations on this request and did not state that he wanted the lawyer for any specific proceeding. Id. 266:13-22. Millul's wife, Jessica Ilitzky Lombrozo, affirmed in her testimony that the FBI agent who called her told her that her husband wanted a securities

21

fraud lawyer, that she heard her husband saying the same thing in the background, and that there was no reference on the call to the request for a lawyer being for the initial court appearance. Id. 214:3-14. Ilitzky Lombrozo also recalled that an agent called her later in the day to tell her the time and place of that day's court appearance. Id. 231:18-23.

Millul also testified, however, that he did not indicate that this request was related to his present interactions with law enforcement, or that he wanted to consult with an attorney before answering further questions. Id. 260:1-18. Millul appeared relaxed at Pretrial Services and chatted with the agents concerning an ongoing soccer game. Id. 257:20-258:8.

The Court finds Millul and Lombrozo's testimony that Millul did not specify that he wanted a lawyer for a specific point in the proceedings credible, and considers it likely that Swanson may have merely understood Millul to be conveying that he wanted an attorney for the court appearance based on the stage that they were at in processing (after the completion of the interrogation and the Pretrial Services interview), rather than any specific statement that Millul made.

However, since the interrogation of Millul had already concluded by this time, the relevance of this request for counsel relates, if at all, only to one subsequent event. Specifically, after the conclusion of the call to Millul's wife,

Agent Anderson arrived at Pretrial Services and told Millul that he had a search warrant for Millul's iPhone that authorized him to use the FaceID feature to unlock the phone if Millul did not provide his passcode.[3] Id. 240:14-22. Millul then provided Anderson with the passcode. Id. 241:3-4.

## B. Discussion

### i. Sixth Amendment

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." "The purpose of the Sixth Amendment counsel guarantee – and hence the purpose of invoking it – is to protect the unaided layman [in] critical confrontations with his expert adversary, the government, after

---

[3] The iPhone Warrant provides that "[d]uring the execution of this warrant, law enforcement personnel are authorized to hold the Subject Device in front of Jeremy Millul's face to activate the FaceID sensor." Millul iPhone Warrant, Govt. Ex. 8. The affidavit accompanying the warrant, in a section entitled "Accessing ESI," further provides as follows:

> At the time the agents execute the requested warrant, they will ask Millul for the passcode or password for the Subject Device. If he refuses to provide the password or passcode, I request that the Court authorize law enforcement to hold the seized device in front of Millul's face for the purpose of attempting to unlock the device via Face ID in order to search the contents as authorized by this warrant.

Govt. Ex. 7 (iPhone warrant application). Anderson testified that the magistrate judge instructed him to ask Millul for his passcode before attempting to use FaceID. Tr. 117:7-10.

23

the adverse positions of government and defendant have solidified with respect to a particular alleged crime." McNeil v. Wisconsin, 501 U.S. 171, 177-78 (1991) (emphasis in original). Accordingly, the Sixth Amendment right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated." Kirby v. Illinois, 406 U.S. 682, 688-89 (1972). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." Rothgery v. Gillespie County, 554 U.S. 191, 213 (2008). The Sixth Amendment right to counsel "does not arise at the time of arrest upon a warrant following the filing of a complaint." United States v. Smith, 778 F.2d 925, 932 (2d Cir. 1985); see also United States v. Duvall, 537 F.2d 15, 22 (2d Cir. 1976) ("We see no reason in principle why the filing of a complaint should be deemed to give rise to a right to counsel immediately upon arrest pursuant to warrant.").

At the time at which Millul was questioned concerning his iPhone passcode and provided the passcode, he had been arrested pursuant to a complaint and had not yet had his initial appearance in court. An indictment was not filed against him until over a month later. See Dkt. 24. Accordingly, Millul's

24

Sixth Amendment right to counsel had not yet attached by the time of the questioning concerning his iPhone passcode.

### ii. Fifth Amendment

The Fifth Amendment guarantees that "no person...shall be compelled in any criminal case to be a witness against himself." In Miranda v. Arizona, 384 U.S. 436, 439 (1966), the Supreme Court established a number of "prophylactic rights," including the right to have counsel present during custodial interrogation, so as to "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." After providing Miranda warnings, law enforcement may then proceed to question a suspect who "knowingly and intelligently waive[s] his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475. But there can be no further questioning if a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking." Id. at 444-45. Furthermore, the suspect's having "answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." Id.

In Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), the Supreme Court further forbid "authorities, at their instance, to

25

reinterrogate an accused in custody if he has clearly asserted his right to counsel." Accordingly, if "a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Davis v. United States, 512 U.S. 452, 458 (1994). But "[a] suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted," and, accordingly, must affirmatively invoke the right to an attorney after a waiver. Id. at 460-61. Assessing whether or not a suspect has done so is an "objective inquiry" into what would be understood by "a reasonable officer in light of the circumstances." Id. at 459.

The Supreme Court has described the Miranda right to counsel as both "broader" and "narrower" than the Sixth Amendment right to counsel. See McNeil, 501 U.S. at 178. It is "broader" because it "relates to interrogation regarding any suspected crime and attaches whether or not the 'adversarial relationship' produced by a pending prosecution has yet arisen." Id. Yet it is "narrower" because "it relates only to custodial interrogation." Id. While, as discussed above, the Sixth Amendment right to counsel "protect[s] the unaided layman at critical confrontations" with the Government generally, the Miranda right to counsel "protect[s] a quite different interest:

the suspect's desire to deal with the police only through counsel." Id. at 177-78.

Accordingly, the Edwards protection against further police-initiated interrogation "applies only when the suspect has expressed his wish for the particular sort of lawyerly assistance that is the subject of Miranda." Id. at 178 (emphasis in original). In other words, "[i]t requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." Id. (emphasis in original). Conversely, a "request for the assistance of counsel in some manner that does not involve assistance in responding to questions by the police" does not trigger the Miranda-Edwards prohibition on further questioning. United States v. Chavez, No. 14-cr-00185(JAM), 2015 WL 1650838, at *5 (D. Conn. Apr. 14, 2015).

In the light of the foregoing legal framework, it is clear from the factual findings made above that the only request for counsel made by Millul that even arguably raises a Miranda-Edwards issue is the colloquy that occurred in connection with the call made to his wife while he was at Pretrial Services. But even though the Court accepts that this was in some sense a request for counsel (and not simply, as Swanson misunderstood, for the initial court appearance), it was not a "wish for the

particular sort of lawyerly assistance that is the subject of Miranda" and, accordingly, did not trigger the Miranda-Edwards prohibition against further police questioning.[4] As discussed above, the Sixth Amendment guarantees a right to counsel, separate from Miranda, in any ensuing criminal case. Those who waive their Miranda rights during questioning may (and often do) arrange for attorneys to represent them in the case as a whole, or in aspects of the case aside from interrogation, without invoking their Miranda right to counsel for assistance with present police questioning. See McNeil, 501 U.S. at 178 (request for assistance of an attorney at a bail hearing not a Miranda request for counsel); United States v. Scarpa, 897 F.2d 63, 66 (2d Cir. 1990) (suspect did not invoke Miranda right to counsel when stated, after arrest, "that he was going to get a lawyer" and referred to a specific lawyer); Chavez, 2015 WL 1650838, at *6 (defendant's request to have an attorney read him the written Miranda rights form did not amount to a request to have an attorney represent him in connection with any questioning); United States v. Lifshitz, No. 03-cr-572 (LAP), 2004 WL 2072468,

---

[4] As discussed above, the Court does not credit Millul's testimony that he requested an attorney during the car ride from the FBI interrogation to Pretrial Services but, even if Millul did state "I want an attorney" during that car ride in the manner he describes, it would not constitute a Miranda invocation of the right to counsel for the same reasons discussed with regards to the request at Pretrial Services.

at *9-10 (S.D.N.Y. Sept. 15, 2004) ("defendant did not unequivocally express his desire to have counsel present by merely placing a telephone call to a lawyer, during which the defendant merely stated, at best, that he wanted the recipient to be his lawyer" and "[a]t no time did the defendant state that he wanted to wait for a lawyer to continue the interview").

Millul argues that his statement to the agent to tell his wife that he wanted a securities fraud lawyer sufficed to invoke his Miranda right to counsel because Miranda does not require a suspect to verbally specify that the request for counsel is for the purposes of questioning. Millul is correct that no such statement is required, but the request for counsel as phrased must be reasonably construable as a desire for the present assistance of counsel in dealing with questioning in the circumstances in which the request is made. See Davis, 512 U.S. at 459 ("Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.") (emphasis added). All of the cases that Millul relies on to support his argument that no specification is required concern a request for counsel made immediately before interrogation was about to commence or

29

during active interrogation, circumstances that made it clear that the request for counsel was for questioning.[5]

In Millul's case, nothing about Millul's statement to the agent that the agent should tell his wife to get him a securities fraud lawyer suggested that Millul was doing anything other than implementing his previously-stated plans to hire an attorney to represent him in the case. The evidence shows no indication that Millul could have reasonably been understood to be requesting assistance in his present interactions with police, the right protected by Miranda. By the time of this statement, Millul had been twice read his Miranda rights and signed a written waiver of them. Of course, a suspect is entitled under Miranda to invoke his right to counsel "at any

---

[5] See Wood v. Ercole, 644 F.3d 83, 91 (2d Cir. 2011)(defendant said "I think I should get a lawyer" after being asked to make a videotaped statement); Abela v. Martin, 380 F.3d 915, 926 (6th Cir. 2004), abrogated on other grounds by Guilmette v. Howes, 624 F.3d 286 (6th Cir. 2010) (defendant stated that "maybe" he should talk to a specific attorney and provided that attorney's business card when police began questioning); United States v. Wysinger, 683 F.3d 784, 795-796 (S.D.N.Y. 2012) (defendant requested to call attorney when agent "opened his notebook, pulled out his pen, and asked [defendant] to 'tell us what has been going on'"); United States v. Seppala, No. 16-CR-436 (KMW), 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017) (defendant asked if could call an attorney immediately after sitting down at "a table where the agents had set up a video camera"); United States v. Lilla, 534 F. Supp. 1247, 1279 (N.D.N.Y. 1982)(invoked where defendant "request[ed] his mother [] reach his attorney by telephone" after arrest and "refus[ed] to respond to questioning"); People v. Ireland, 70 Cal. 2d 522, 532-33 (1969) (defendant said "call my parents for my attorney" immediately after being arrested and advised of his Miranda rights).

30

stage of the process," regardless of how many questions have been answered. Miranda, 384 U.S. at 445-45 ("there can be no questioning" if the person in custody "indicates in any manner and at any stage of the process that he wishes to consult with any attorney before speaking"). But, as a suspect who had "knowingly and voluntarily" waived his right to counsel and "indicated his willingness to deal with the police unassisted," Millul was required to affirmatively invoke that right to subsequently claim it. Davis at 459.

It should be recalled that, after previously waiving his Miranda rights, Millul had given a full interview to the FBI. Twice during this interview, Millul debated whether he should get a lawyer prior to answering further questions. Each time, the FBI paused the interview to clarify with Millul whether he was in fact invoking his right to an attorney, stating that they could not go forward with the interview if Millul wanted an attorney present and that Millul needed to give "an affirmative yes or an affirmative no" after raising the issue of counsel. Twice, Millul changed his mind about obtaining a lawyer and chose to continue the interview. In his testimony at the suppression hearing, Millul acknowledged that he understood that he had the right to stop the interview at any time but chose to continue the interview as he believed he could "clear up" the case on his own. In other words, Millul appeared confident in

31

his ability to deal with law enforcement questioning without assistance. Moreover, Millul exhibited awareness that he could refuse to answer questions or provide information when he repeatedly refused to provide the passcode to his phone, while answering other questions.[6]

Millul did have questions about the process going forward and the process for obtaining counsel, addressed at the end of the FBI interview, when he stated that he had the funds and planned to hire an attorney. But "courts routinely reject the contention that [] inquiries into the operation of the right to counsel constitute invocations of that right." United States v. Peter, No. 17 CR 054 (NRB), 2018 WL 5282878, at *3 (S.D.N.Y. Oct. 24, 2018) (collecting cases).

All substantive questioning and interrogation of Millul concluded when he left the FBI office, and had clearly ended by the time he made his request for the FBI to call his wife and instruct her to obtain a securities fraud attorney for him.

---

[6] As discussed above, the Court does not credit Millul's testimony that he was unaware he could hire an attorney before the Pretrial Services process was complete, which was contradicted by his testimony that he understood he could get the assistance of counsel at any time and by his brief invocation of the right to counsel during the videotaped interrogation. The Court also assigns little weight to the fact that Millul had no prior experience with the criminal justice system, as Millul's rights were repeatedly, carefully explained to him and he testified repeatedly that he fully understood those rights.

32

After the FBI interrogation concluded, Millul continued to display comfort and confidence in his interactions with the FBI agents, declining to supply his iPhone passcode, initiating discussions of his marital issues with the agents, and attempting to watch a soccer match and otherwise converse with the agents. See Scarpa, 897 F.2d at 67-68 (finding it relevant to waiver that the defendant "consistently chose to confront law enforcement officers without assistance," appeared "confident in his own ability to deal with law enforcement officers," and had "relaxed and friendly" exchanges with the agents). In short, nothing about Millul's statement that he wanted a securities fraud lawyer, made in the context of a telephone call to his wife to have her retain counsel, conveyed the Millul was doing anything other than implementing previous plans to hire an attorney for the case.

Accordingly, the Court finds no ground for suppression based on the subsequent questioning concerning Millul's iPhone passcode.

For the foregoing reasons, both defendants' motions to suppress are hereby denied.

SO ORDERED

Dated:    New York, NY
          February 1?, 2019

                                      JED S. RAKOFF, U.S.D.J.